PAN AMERICAN REFINING CORP.
v.
UNITED STATES.
Civ. No. 1475.

United States District Court,
S. D. Texas, Galveston Division.
Dec. 8, 1953.

Armstrong, Bedford & Lambdin (F. G. Bedford), Galveston, Tex., for plaintiff.

Brian S. Odem, U. S. Atty., and Wm. R. Eckhardt, Asst. U. S. Atty., Houston, Tex., for defendant.

CONNALLY, District Judge.

The action is one by Pan American Refining Corporation to recover transportation taxes assessed and collected for the years 1946, 1947, and a portion of 1948, for the transportation by plaintiff of crude oil or its products by pipe line, pursuant to Sec. 3460 of the Internal Revenue Code, Title 26, U.S.C.A. The facts, while somewhat involved, are largely without dispute. In the main, they are covered by a full stipulation of the parties, to which I refer and which I adopt. There remains primarily for the Court the question of applying to the admitted facts the terms of Sec. 3460(c)

"Exempt Transportation",[1] and a determination whether the several types of movement of oil and its products, as hereafter described, are movements "within the premises of a refinery", as used within the aforementioned section, and hence exempt from tax.

The facts of this case are strikingly similar to those presented by Republic Oil Refining Co. v. Granger, D.C., 98 F. Supp. 921, affirmed 3 Cir., 198 F.2d 161, wherein the taxpayer there, being the plaintiff's immediately adjacent neighbor, contested the imposition of the transportation tax upon similar movements of oil. By reason of this geographical and factual similarity, I refer to the opinion of Chief Judge Gourley of the Western District of Pennsylvania for an extended discussion of some of the questions upon which I do not consider it necessary to dwell at length. That case, in my opinion, applied the correct rule of statutory interpretation and I expect to follow it in that regard. However, I am not in entire accord with other phases of the opinion.

A careful examination of Exhibits "2" and "4", being maps of the area involved, is necessary for an understanding of the questions presented. In the early 1930's, the officers of plaintiff corporation cast about for a site for the construction of a refinery. They were primarily interested in securing a location from which the company could serve the eastern seaboard markets feasibly and economically. The availability of deep water to the site selected was of primary and controlling importance. These considerations, with others, resulted in the acquisition of the properties hereinafter described upon which the refinery was constructed.

In 1933, several tracts of land were purchased (as reflected in detail by the stipulation and by Exhibit "4"), aggregating some 400 to 500 acres. This property, together with later acquired properties which were necessary to accommodate the expanding operations, and which at all times pertinent hereto have constituted a contiguous block, is located from one and one-half to two and one-half miles from the Harbor Line at the Texas City water front. This property, throughout the trial, has been referred to as the *"fee property"*. Contemporaneously with the initial purchases of fee property in 1933, and as a necessary and integral part of its program to construct and operate a refinery, plaintiff acquired a fifty year lease on a tract of 1.01 acres abutting the Harbor Line. This leasehold estate was acquired for the location of loading and unloading docks, and throughout the trial was referred to as the *"dock site"*. Likewise as part of its program, plaintiff acquired right-of-way easements from its fee property to the dock site (as reflected by Exhibits "2" and "4") for placing of oil lines, water lines, power lines, telephone and telegraph lines, etc. This property interest is referred to as the *"easement corridor"*. It should be understood that the acquisition of such right-of-way easements was not in the least unusual; for the entire area wherein plaintiff's properties are located, is now, and was then to a lesser extent, highly industrialized; with various pipe lines, railroad trackage and other facilities there present making direct access to deep water available to those industries which are located in the vicinity.[2]

After the acquisitions above referred to (1933), plaintiff began the construction of its refinery proper and its related facilities. These were all planned, designed, and constructed to operate as a single functional unit.

[1] "For the purposes of this section, the term 'transportation' shall not include any movement through lines of pipe within the premises of a refinery, a bulk plant, a terminal, or a gasoline plant if such movement is not a continuation of a taxable transportation. The crossing of rights-of-way, streets, highways, railroads, levees, or narrow bodies of water, in connection with such a movement, shall not of itself constitute such movement as being 'transportation' ".

[2] See the last paragraph beginning on page 930 of 98 F.Supp. of Republic Oil Refining Co. v. Granger, supra.

Upon the fee property, the plaintiff erected its stills and cracking units, where, by the application of heat, pressures, and other procedures, the chemical changes in the composition of the product are accomplished. Likewise on the fee property, plaintiff constructed many tanks for the storage, mixing, and blending of its raw material, its finished products, and its products in various stages of completion. Several pump houses were located at strategic points, in each of which a number of pumps were installed. These pumps were used to transfer the liquids by means of a veritable maze of pipe lines between the various facilities, storage and mixing tanks, etc. These pumps were likewise used, as hereinafter more fully discussed, in moving the refined products from the fee property through pipe lines along the easement corridor.

On the leasehold estate (dock site), plaintiff constructed a substantial dock adequate in size to accommodate two seagoing tankers and some five barges contemporaneously. Certain pumps were installed to be used to unload those barges which did not have suitable pumping equipment. There likewise were installed the necessary complexities of pipes and valves incident to receiving crude oil from the vessels at the dock, and to loading the refined liquid petroleum products onto vessels at the docks.

Along the easement corridors the plaintiff installed a series of pipe lines (three along the northern corridor; eight along the southern corridor) for the movement of crude oil, fuel oil, furnace oil, gasoline, kerosene, etc., between the fee property and the dock site.[3]

The fourth property or type of property, the location of which is of prime importance, is that referred to as the *"Stone Property"*.

For a number of years prior to April 1, 1948 (thus, during most, but not all, of the period in issue) this tract of 24.-304 acres, located to the northeast of plaintiff's fee property at a distance of some 2,000 feet, was owned by Stone Oil Company, where that concern operated its refinery. Under contract between Stone Oil Company and plaintiff, certain of the refining processes were performed by Stone for plaintiff upon plaintiff's crude. This oil was transmitted to Stone by pipe lines connecting the Stone refinery with plaintiff's easement corridor pipe lines; and thereafter such oil or the partially refined products therefrom were returned via such pipe lines to plaintiff's fee property where the refining operations were completed. On April 1, 1948, plaintiff purchased the Stone property from Stone Oil Company and since that date has operated the facilities there in conjunction with and as an integral part of its own refinery operations.

The movements by pipe line upon which the Government has imposed and collected the tax, and which the plaintiff here contests, are of four types.

First, there is the movement of crude oil from the dock site to the fee property through the easement corridor. This crude oil is plaintiff's raw material; and about twenty percent of the refinery's total consumption is received in this fashion.[4] By agreement with the shipping concerns, plaintiff accepts delivery of such crude oil where plaintiff's hose (attached to its pipe line along the easement corridor) attaches by a flange to a similar connection on board the vessel. The vessel's pumps propel the crude oil through the pipe lines the distance of some two miles and into the storage tanks upon the fee property.

The second type movement involved is a similar movement of the finished

---

**3.** As reflected by Exhibit "2", all of these lines were not constructed in 1933 as a part of the original construction. Some were added later along with the acquisitions of additional property and the ex-

pansions of plaintiff's facilities in the late 1930's and early 1940's.

**4.** The remainder is received at the fee property by large cross-country pipe lines from the East Texas and other oil fields.

products from the fee property through the pipe lines along the easement corridor to the waiting vessel at the dock site. Delivery is made by plaintiff to the vessel at the flange. About ninety-five percent of plaintiff's finished products move in this fashion.[5] Pumps located on the fee property furnish the propelling force.

The third type movement involving a rather small quantity of oil results from those instances wherein the plaintiff has sold and delivered either crude oil or its refined products to some neighboring refinery (the evidence reflects certain sales of this type to the Richardson Refining Company). In these cases, the petroleum or petroleum product was transmitted from plaintiff's fee property along the easement corridor to a point (referred to in the evidence as a "jump over point") where a pipe line leading to the refinery of the purchaser intersected and tied into that of the plaintiff, through which such petroleum or its product was diverted into the hands of the purchaser.

The fourth type movement in issue concerns movement to and from plaintiff's fee property to the Stone property. It will be remembered that prior to April 1, 1948, the Stone refinery had been operated by Stone Oil Company and that subsequent to that date it was operated by plaintiff.

After the evidence was closed, counsel for the plaintiff conceded in open court that movements of oil from plaintiff to a neighboring purchaser (the third type of movement mentioned above) properly were taxable on leaving plaintiff's pipe line; and likewise conceded that prior to April 1, 1948, the movements of oil and its products to and from plaintiff's property to Stone property were taxable. Thereafter, counsel for the Government conceded that subsequent to April 1, 1948, movements from plaintiff's fee property to and from Stone property were not taxable.

■ Thus there remains for consideration by the Court only the incoming movement of crude, and the outgoing movement of gasoline, kerosene and other finished products from and between the fee property and dock site.

The question posed by these facts is whether the lines of pipe along the easement corridor and across the dock are "lines of pipe within the premises of a refinery," as used in Sec. 3460(c). The Government urges a strict interpretation of the terms "premises of a refinery"; during the trial their counsel argued that the term "refinery" means only that area where refining operations, as such, are carried on; that under the present facts, this is the fee property which, as stated, is a large contiguous tract surrounded by a substantial fence; and when the petroleum or its products in moving by pipe line passed beneath the fence line of the fee property, such movement thereafter constituted taxable transportation.

Taxpayer places principal reliance upon the Republic Refining Co. case hereinabove referred to, and following the reasons therein advanced, contends here that in truth and fact, it maintained only a single integrated operation, a single facility, at Texas City; that the deep water terminal was a necessary part of its operation; that it had, as a part and parcel of its initial acquisitions for the construction of its refinery, acquired a property interest in and across all of the land between its fee property and the harbor line; that this property interest and the leasehold estate upon the waterfront were just as much a part of "the premises" of its refinery as were the stills and cracking units upon its fee land.

I think that taxpayer is right, and that the movements in question fall within the exemption.

■ While reaching the same result as did Chief Judge Gourley in the Republic case, I do so by a somewhat di-

5. A small portion moves by railroad tank cars or by tank trucks, which are loaded at loading racks on the fee property.

vergent route. I am unable to agree that the definition of "premises" is dependent upon state law, or that the use of a pipe line for blending purposes will extend the geographical limits of "refinery premises".

The Republic case holds that where the easement in question is appurtenant to fee property and acquired in a single conveyance from a single grantor, that such an interest in land is sufficient to bring it within the definition of "premises", while inferentially were the easement in gross and acquired under circumstances other than those mentioned above, it would not meet the test. I adhere to the view that it is not the character of the interest in property which is determinative, but rather the use or function to which that interest in property is devoted.[6] Obviously, "premises" refers to some geographical area. To my mind, it means the entire area devoted in the normal and customary fashion, to refinery purposes. That includes not only the area where the crude oil undergoes the "topping", the "cracking" and other such processes necessary to accomplish the chemical changes; it includes the areas where the oil is received, stored, and transported in and around the refinery, prior to its departure in finished form. Such reception, storage and transportation, while incidental processes and procedures, are just as essential in the refining process as are those first mentioned. The transportation between the dock site and the fee property and return is fundamentally of this character. The loading lines, the pipe lines, and all of the pipes, valves and other paraphernalia are operated and maintained by the ordinary refinery personnel. Those employees work upon the fee property, the easement corridor or the dock site interchangeably. The pipe itself, the type of pumps, and other equipment are of a kind and character

normally used in and around a refinery for the short-haul movement of oil rather than of the character normally employed by pipe line companies or others where transportation, as such, is the sole object. No storage tanks for the crude or refined products are maintained on the dock site, and the products never come to rest there. By a single pumping operation it moves from vessel to storage on the fee property, and after refining, back again in the same manner. This distance of some two miles is well below that for which long distance type pumps, pipe, etc. would be required. It is not unusual for the refinery employees to effect a transfer of oil of a distance equally as great *within the confines of the fee property*. The same pumps are used for all such transfers.

The plaintiff's case is not strengthened by their argument that "blending" (as the name implies, a physical mixing of different grades or types of petroleum products to bring about a desired mixture) is a refining process, and that because such blending from time to time takes place in the pipe lines in question, such pipe lines thus become a part of the refinery premises. While blending may normally be a refinery process and customarily may be done in and around a refinery, it does not follow that it can only be performed there; nor does it follow that wherever such blending does occur, such area ipso facto constitutes the premises of a refinery. It frequently is accomplished by pumping the different ingredients into pipe lines, where they are thoroughly mixed by being forced under pressure to the pipe line terminus. In other cases, it is accomplished by pumping the desired ingredients into a tanker where they are mixed by the motion of the vessel. Where transportation is the primary object, and the blending is incidental, such transportation through the

---

6. Under the present facts, this question is not determinative here, for it has been agreed that the plaintiff's easements here are appurtenant to its fee property. As such they constitute interests in realty under the law of this State and are an inherent part of the fee premises; and are of the same dignity as those in the Republic case.

pipe line is not thereby exempt from tax. McKeever v. Fontenot, 5 Cir., 104 F.2d 326.

Counsel for the Government makes much of the fact that there are instances, reflected by published tariffs and other documentary evidence, where transportation services of this character are furnished by common carrier pipe lines. Undoubtedly this is true, and I suspect that had plaintiff and its neighbor Republic been unable to acquire the necessary easements between their fee premises and the water front, some common carrier pipe line, with the right of eminent domain, would have made these services available. But the fact that under other circumstances some common carriers do furnish the service is not sufficient to convince me that it is the type of service normally and customarily performed by common carrier.[7] On the contrary, I find that it is normal and customary for such transportation as is in issue here to be handled by the taxpayer, or one in its position, as an incidental part of its over-all refining operations; it is more economical and practical for it to be handled by ordinary refinery personnel; and that the services of a common carrier are availed of only when the circumstances demand it. When the distance for such movement exceeds about five miles, the reverse is true.

The interpretation which is urged by the Government seems strained and unnatural, with undue emphasis upon a too literal reading. The last sentence of Sec. 3460(c)[8] indicates that it was not the intention of the Congress to restrict the definition of "within the premises of a refinery" to a single contiguous tract; but rather that the Congress recognized that short-haul movement between non-contiguous tracts did not, alone, constitute taxable transportation. But the Government argues that such short-haul movement here was not for the purpose of crossing a right-of-way, or a street, a highway, a railroad, a levee or a narrow body of water; and that other types of short-haul movement between non-contiguous tracts (as here) are beyond the terms of the exception. A great deal of the force of this argument is lost by reason of the concession made by Government's counsel at the close of the evidence, namely, that movements between the fee property and the Stone property, after the latter was acquired by plaintiff, were exempt. If such movement of oil remained "within the premises" of plaintiff's refinery as it (a) passed beneath the fence of the fee property; (b) proceeded along the easement corridor about half the distance to the dock site; (c) then was diverted northward an additional distance of about ¼ mile to Stone; all the while passing beneath land owned by another and in which plaintiff had only a right-of-way easement, then I am of the opinion it remained within the premises as it passed the remaining distance down the easement corridor to the loading dock where plaintiff, through its refinery employees, surrendered possession of the finished product and started it on its journey to market.

Functionally, such a movement is no different from a movement from storage tanks to loading docks *on the fee property* where tank cars and tank trucks are loaded, which admittedly is not taxable. In each instance it is there at the loading point where refining ends and transportation begins, and where the movement first becomes subject to the tax.

Concluding, the movements from dock site to fee property, and return, are within the premises of plaintiff's refinery, and are exempt; the movements

---

7. As pointed out on page 933 of 98 F. Supp. of the Republic opinion, this question was one of controlling importance under the earlier statute and regulations; of considerably less significance now.

8. "The crossing of rights-of-way, streets, highways, railroads, levees, or narrow bodies of water, in connection with such a movement, shall not of itself constitute such movement as being 'transportation'."

to and from the fee property to Stone property prior to April 1, 1948 are taxable, such taxable transportation beginning at the jump over point on plaintiff's pipe line; after April 1, 1948, such transportation to and from Stone was not taxable; on sale and delivery to plaintiff's neighbors, such transportation was taxable on leaving plaintiff's easement corridor pipe line at the jump over point. From the stipulation counsel may determine the amount of tax wrongfully collected, and the amount of plaintiff's recovery and will submit decree accordingly.

The foregoing is adopted as Findings of Fact and Conclusions of Law.

Clerk will notify counsel.