BOARD OF EDUCATION OF CORNELL COMMUNITY HIGH SCHOOL, DISTRICT 70, Plaintiff-Appellant, *v.* PROPERTY TAX APPEAL BOARD OF THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

Fourth District   No. 17459

Opinion filed May 5, 1982.

Arvey, Hodes, Costello & Burman, of Chicago (Nathan M. Cohen, Robert M. Sarnoff, and Glen F. Zatz, of counsel), for appellant.

Tyrone C. Fahner, Attorney General, of Chicago (Russell C. Grimes, Jr., Assistant Attorney General, of counsel), for appellee Property Tax Appeal Board of the Department of Revenue.

Schiff, Hardin & Waite, of Chicago, and Frank M. Brady, of Dunn, Brady, Goebel, Ulbrich, Morel, Kombrink & Hundman, of Bloomington (Aaron J. Kramer and Peter V. Baugher, of counsel), for appellee Arco Pipe Line Company.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

The issue here is whether crude oil, temporarily in tanks at the Flanagan Station of the Cushing-Chicago Pipe Line System located at Cornell in Livingston County, was (1) subject to assessment and taxation as personal property pursuant to section 18 of the Revenue Act of 1939 (Ill. Rev. Stat. 1979, ch. 120, par. 499), or (2) exempt from such tax under the commerce clause.

The pipe line system extended some 600 miles from Cushing, Oklahoma, to Northwestern Indiana carrying oil in a northeasterly direction. The Flanagan Station had 14 tanks connected to the pipeline. When oil reached the station, it was diverted to various tanks in such a way as to blend various grades of crude oil into particular mixtures as desired by

those to whom the oil was being shipped. The blended oil was then sent on. The parties agree that while the oil moved through the pipeline it was immune from local property taxation by the commerce clause. However, the interruption of a shipment of goods in interstate commerce "for a separate business purpose unrelated to the safe transportation of the goods, * * * for processing or for holding the goods pending receipt of orders" will withdraw the goods from the stream of commerce. (J. Nowack, R. Rotunda & J. Young, Constitutional Law 291 (1978).) The precise question presented is whether the placement of the oil in the tanks for blending purposes provided a nexus for a local property tax on the oil. We conclude that it did not.

Defendant, Arco Pipe Line Company (APL), owner of a 70% undivided interest in the Cushing-Chicago Pipe Line System, filed a personal property schedule with the assessor of Esman Township, Livingston County, covering the assessment date of April 1, 1978. Flanagan Station is located in that township. The statement did not make any reference to oil stored in any of the tanks at the station. No assessment was made for any oil so stored. Plaintiff, Board of Education of Cornell Community High School, District 70, a taxing unit within whose boundaries Flanagan Station was located made objection to the Livingston County Board of Review. On September 9, 1978, the Board of Review ordered the assessment to stand. Plaintiff appealed to defendant, Property Tax Appeal Board (PTAB), which, after a *de novo* hearing (Ill. Rev. Stat. 1979, ch. 120, par. 592.2) entered an order on May 1, 1980, upholding the assessment. Plaintiff then filed for administrative review in the circuit court of Cook County. Upon motions of defendants, that court found the proper venue to be in Livingston County (Ill. Rev. Stat. 1977, ch. 110, par. 268) and transferred the case to the circuit court of that county. After a hearing, that court affirmed. We, in turn, affirm the circuit court.

The evidence was undisputed that the pipeline carrier had no ownership in the oil and no power to direct to whom it would be delivered. The oil was not kept long in the tanks, for it traveled through the entire 600-mile pipeline in an average of six days. A witness for plaintiff, Donald Oberle, a chemical engineer, testified that the storage and blending was for the benefit of the shipper, the pipeline carrier, and the purchaser. He described the blending as a method to enable the pipeline to store more oil in fewer tanks because the oil was received in more different grades than needed by the purchasers. He said that by storing, the pipeline could continue to meet demand in the event of a stoppage closer to the source than the station where the storage occurred. He called the blending the first stage in manufacturing of the refined product, because it was a function the refiner would have to perform if not done before it reached the refiner. The evidence was undisputed that the pipeline carrier re-

ceived no extra compensation for the blending, but a witness for APL admitted it might lose business if the blending were not performed.

The PTAB found: (1) the tanks were an "integral part of the pipeline system" and did not "constitute storage for a break in the interstate flow of the product"; (2) the blending was not "a part of the production or manufacturing of a final product"; and (3) transportation of the oil was "APL's primary function while blending [was] in fact incidental." The circuit court held those findings to be properly supported by the evidence and agreed with the PTAB's conclusion that the oil was immune from local taxation. Plaintiff argues that (1) the blending was not incidental; and (2) because the blending was done as a step in the manufacturing of the product with the incentive of enhancing the business and thus the profit of APL, the storage and blending did constitute a break in the interstate flow of the product which would render it subject to tax.

We consider the instant situation to have been materially different than that in the various cases cited by plaintiff where the processing of goods in transit were held to constitute a break in the transit subjecting the goods to local taxation. In *General Oil Co. v. Crain* (1908), 209 U.S. 211, 52 L. Ed. 754, 28 S. Ct. 475, oil was being stored in tanks for a substantial period pending distribution pursuant to orders already received. (See also *McCutchen v. Board of Equalization of Taxes* (1915), 87 N.J.L. 370, 94 A. 310.) In *Bacon v. Illinois* (1913), 227 U.S. 504, 57 L. Ed. 615, 33 S. Ct. 299, grain was owned and held by an elevator operator for purposes of inspecting, weighing, cleaning, clipping, drying, sacking, and mixing as specified in contracts of sale. Although the owner had the privilege of continuing the transportation under shipping contracts with railroads, he had the right to deal with the grain as he saw fit. In *Missouri-Pacific R. Co. v. Schnipper* (E.D. Ill. 1931), 51 F. 2d 749, railroad ties were being held for three or four months before further shipment.

In *State v. Continental Oil Co.* (1944), 218 Minn. 123, 15 N.W. 2d 542, gasoline was being held by a pipeline operator for the purpose of adding lead, coloring, oils, solvents, and highly volatile gasoline. In *Standard Oil Co. v. Combs* (1884), 96 Ind. 179, an interstate shipment of staves was interrupted in transit to be passed through a machine which cut them to uniform length and thickness. The procedure constituted the finishing process in their manufacture. In *Republic Oil Refining Co. v. Granger* (3d Cir. 1952), 198 F.2d 161, the blending of oil took place in a pipeline only one-half mile in length and adjacent to a refinery which was the destination of the oil. The movement of the oil through the pipeline was deemed to be incidental to the operation of the refinery.

In *Pan American Refining Corp. v. United States* (S.D. Tex. 1953), 119 F. Supp. 698, the court examined the question of whether oil in pipelines was subject to a transportation tax. The court stated that the plain-

tiff's case was not strengthened by their argument that blending was a refining process, and when blending occurs in pipelines such pipelines become part of the refinery process. The court recognized that blending is normally a refinery process but that frequently blending is accomplished by pumping a different ingredient into pipelines where they are thoroughly mixed by being forced under pressure to the pipeline terminus. The court found that the blending was incidental where transportation was the primary object, and the transportation through the pipeline would not therefore be exempt from the transportation tax. On the other hand, in *Southern Minerals Corp. v. United States* (S.D. Tex. 1956), 150 F. Supp. 646, that court had held blending operations not to be part of a through shipment of oil when they occurred after oil had been delivered to its owner's premises and was awaiting shipment under specific sales contracts.

The situation at the Flanagan Station was more like that in *Pan American Refining Corp.*, where the blending took place in a pipeline, than in *Southern Minerals Corp.*, where it took place at the refinery after the completion of transportation through a pipeline. We do not interpret *Pan American Refining Corp.* to have indicated that the mere use of tanks to accomplish the blending would necessarily make the blending part of the refining process. We note that in *Eureka Pipe Line Co. v. Hallanan* (1921), 257 U.S. 265, 272, 66 L. Ed. 227, 232, 42 S. Ct. 101, 103, in an opinion holding a State tax on transporting petroleum invalid as to an interstate pipeline, Mr. Justice Holmes mentioned that as oil "runs into a tank on one side and out on the other," the tank "may be regarded as a pipe of larger size."

Defendants cite no cases where the placement of a property tax on goods temporarily delayed in interstate transit for processing has been held to be an undue burden on interstate commerce. They place substantial reliance upon language in *Maryland v. Louisiana* (1981), 451 U.S. 725, 68 L. Ed. 2d 576, 101 S. Ct. 2114. There, the United States Supreme Court held to be invalid a tax placed by the State of Louisiana upon the first use of natural gas made in the State whether it be a processing of the gas or immediate transmission of it to interstate or intrastate customers. The Act contained exemptions of benefit to intrastate customers, and the court held it to be an undue burden on interstate commerce for that reason. Defendants place emphasis upon the court's statement that:

> "Initially, it is clear to us that the flow of gas from the OCS wells, through processing plants in Louisiana, and through interstate pipelines to the ultimate consumers in over 30 States constitutes interstate commerce. Louisiana argues that the taxable 'uses' within the State break the flow of commerce and are wholly local events. *But although the Louisiana 'uses' may possess a sufficient local*

nexus to support otherwise valid taxation,[27] we do not agree that the flow of gas from the wellhead to the consumer, even though 'interrupted' by certain events, is anything but a continual flow of gas in interstate commerce. Gas crossing a state line at any stage of its movement to the ultimate consumer is in interstate commerce during the entire journey. [Citations.]" (Emphasis added.) 451 U.S. 725, 754-55, 68 L. Ed. 2d 576, 601, 101 S. Ct. 2114, 2133-34.

Footnote 27 to *Maryland v. Louisiana* states in part:

"The United States suggests that the uses enunciated in the Act do not have a sufficient local nexus to support the Tax under the Commerce Clause. See *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U.S. 157 [, 98 L. Ed. 583, 74 S. Ct. 396] (1954). While the local nexus of certain of the uses is suspect, other uses would appear to have a substantial local nexus so that on the present record it would be difficult to say that the entire Tax was unconstitutional on this ground." 451 U.S. 725, 755, n.27, 68 L. Ed. 2d 576, 601 n.27, 101 S. Ct. 2114, 2133 n.27.

In *Michigan-Wisconsin Pipe Line Co.,* a State tax on the occupation of gathering or collecting gas from wells was held to be an undue burden on interstate commerce as applied to a pipeline receiving gas for transmission to interstate customers. The quoted language from *Maryland v. Louisiana* does not guide us in determining whether the act of the pipeline carrier in the instant case in blending the oil in the tanks gives the oil sufficient nexus in Illinois for imposition of a local property tax even though the "interruption" caused thereby would not otherwise keep the oil from being in the flow of interstate commerce.

After considering the authorities cited we agree with the trial court that the findings of PTAB were not contrary to the manifest weight of the evidence. We are also in substantial agreement with the reasoning of the trial court in its order of affirmance. The blending was the "natural physical result of running two or more grades of oil together as they [moved] under pressure through working tankage along the pipeline." The oil moved through Flanagan Station relatively rapidly. The blending process was a most simple one. Nothing was added to the oils that had not come through the pipeline and nothing was taken out. If the tanks are considered an extension of the pipeline (*Eureka Pipe Line Co.*), the goods in transit were never taken out of the pipeline. Although the blending was of economic value to the recipient at the end of the pipeline, the value was not sufficient to be stated as an element of the charge made by the pipeline. Some evidence was presented that the blending was of some benefit to the carrier. Our affirmance is based upon our agreement that the blending of the oil in the tanks was too minor and incidental a part of the interstate transit of the oil to give it a nexus for local taxation.

Because of our determination, we need not discuss the dispute between the sides as to whether had the oil been subject to personal property tax, APL would have been (1) required to list the oil in its schedule filed with the township assessor, and (2) liable for the tax on the oil.

We affirm.

MILLS and LONDRIGAN, JJ., concur.